IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Odessa Jackson, | ) | C/A No.: 1:19-2683-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of Honorable David C. Norton, United States District Judge, dated August 10, 2020, referring this matter for disposition. [ECF No. 25]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 24].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied

the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for an award of benefits.

## I. Relevant Background

### A. Procedural History

On November 22, 2013, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on September 16, 2010.[1] Tr. at 103, 104, 449–55, 456–61. Her applications were denied initially and upon reconsideration. Tr. at 203–07, 208–13. On October 25, 2016, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Tammy Georgian. Tr. at 42–70 (Hr'g Tr.). The ALJ issued an unfavorable decision on February 8, 2017, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 157–75. The Appeals Council granted Plaintiff's request for review and remanded the case to the ALJ. Tr. at 176–80. Plaintiff appeared before the ALJ for a second hearing on July 17, 2018.[2] Tr. at 16–35. The ALJ issued a second unfavorable decision on December 11, 2018. Tr. at 181–202. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this

---

[1] Plaintiff filed a prior claim for benefits that was denied in a final decision dated September 15, 2010. Tr. at 142–56.

[2] Although Plaintiff appeared for a hearing on June 14, 2018, it did not go forward because multiple medical records remained outstanding. *See* Tr. at 36–41.

action seeking judicial review of the Commissioner's decision in a complaint filed on September 23, 2019. [ECF No. 1].

### B.    Plaintiff's Background and Medical History

#### 1.    Background

Plaintiff was 59 years old at the time of the first hearing and 60 years old at the time of the second hearing. Tr. at 16, 42, 103. She obtained an associate degree. Tr. at 48–49. Her alleged onset date ("AOD") of disability is July 19, 2012.[3] Tr. at 57.

#### 2.    Medical History[4]

On July 9, 2004, Plaintiff underwent surgical implantation of a permanent dual-chamber pacemaker for neurocardiogenic syncope and symptomatic bradycardia. Tr. at 839–40. Plaintiff also underwent surgical carpal tunnel release on an unspecified date and anterior cervical discectomy and fusion ("ACDF") at the C5–6 level in 2008. Tr. at 635, 1350, 1381, 1382, 2103–04.

In a letter dated January 14, 2010, Julie Desmarteau, PA-C ("PA Desmarteau"), at the Neurology Clinic at the Medical University of South Carolina ("MUSC") explained that Plaintiff "suffered from non-epileptic

---

[3] During the first hearing, Plaintiff moved to amend her AOD to July 19, 2012, to coincide with her fifty-fifth birthday. Tr. at 57.

[4] The record contains evidence from many years prior to Plaintiff's AOD. The court declines to summarize all of this evidence, but has cited the most significant findings in Plaintiff's medical history prior to her AOD.

events ("NEE") that resembled seizures, but were caused by psychological factors, as opposed to electrical disruptions of the cerebral cortex. Tr. at 628–29.

Plaintiff was hospitalized at Conway Medical Center after suffering a transient ischemic attack ("TIA") on March 31, 2010. Tr. at 963–64, 971.

Plaintiff presented to pulmonologist Desmond J. Young, M.D. ("Dr. Young"), on March 29, 2011, following a recent hospitalization for asthma exacerbation. Tr. at 733–37. Dr. Young noted Plaintiff continued to have a mild cough and intermittent wheezing. Tr. at 733. He also observed a restricted oropharynx and decreased bilateral breath sounds. Tr. at 735. He stated Plaintiff appeared to have severe, persistent asthma. Tr. at 736. He increased Advair 500/50 to twice a day and instructed Plaintiff to continue to use Albuterol, Singulair, a nebulizer, and a continuous positive airway pressure ("CPAP") machine. *Id.* He recommended Plaintiff try to obtain an ideal body weight with diet, exercise, and weight loss. *Id.*

Plaintiff underwent spirometry on April 21, 2011. Tr. at 1067. Dr. Young noted Plaintiff was unable to complete diffusing capacity for carbon monoxide ("DLCO") testing because of coughing. *Id.* He assessed moderate restriction and no bronchodilator response. *Id.*

Plaintiff presented to cardiologist John Ijem, M.D. ("Dr. Ijem"), for a pacemaker check on January 12, 2012. Tr. at 1080. She reported controlled

hypertension on her medication regimen, denied chest pain and dyspnea, and indicated she was engaging in moderate exercise. *Id.* Dr. Ijem noted no abnormal findings, aside from obesity. Tr. at 1082–83. He scheduled Plaintiff for a pacemaker battery exchange that was carried out successfully on January 20, 2012. Tr. at 1083, 1087–90. Plaintiff followed up with Dr. Ijem on January 30, 2012, and reported no problems. Tr. at 1097–1100.

On April 17, 2012, Plaintiff endorsed baseline symptoms of intermittent dyspnea and wheezing and reported using her Albuterol rescue inhaler three times a week. Tr. at 1110. Dr. Young noted a prolonged expiratory phase, but otherwise normal findings on physical exam. Tr. at 1112. He continued Plaintiff's medications, discussed weight loss, and ordered chest x-rays and pulmonary function tests. Tr. at 1112–13.

On May 13, 2012, x-rays of Plaintiff's hips showed mild degenerative arthritis of the left greater than right hip. Tr. at 1269.

Plaintiff presented to her primary care physician, Joan Wynn Taylor, M.D. ("Dr. Taylor"), for right hip pain on May 15, 2012. Tr. at 1816. She reported the pain had begun three weeks prior and described difficulty ambulating and joint pain and swelling. *Id.* Dr. Taylor noted no abnormal findings. Tr. at 1817. She ordered an arthritis panel and other lab work and assessed osteoarthritis. Tr. at 1818.

On May 25, 2012, Plaintiff endorsed right hip pain and some arm symptoms. Tr. at 690. Orthopedic surgeon Mark E. Triana, D.O. ("Dr. Triana"), observed Plaintiff to appear "uncomfortable due to pain" and to demonstrate negative bilateral straight leg raise ("SLR") tests, normal reflexes, and crepitance in her bilateral knees. *Id.* Dr. Triana believed Plaintiff's symptoms were coming from her back, as opposed to her hip. *Id.* He ordered computed tomography ("CT") myelograms of Plaintiff's back and neck. *Id.*

Plaintiff underwent CT myelograms of her cervical and lumbar spines on June 14, 2012. Tr. at 692–97. The CT myelogram of Plaintiff's cervical spine showed prior ACDF at C5–6 with mild adjacent-level degenerative arthritis and disc disease, more prominent at C4 than C6. Tr. at 697. It also showed moderate narrowing of the left C5–6 neural foramen that had progressed since May 12, 2010 due to bony hypertrophy that approached, but did not definitely contact, the exiting left C6 nerve root. *Id.* The CT myelogram of Plaintiff's lumbar spine was largely unremarkable, aside from mild degenerative facet arthritis at L5–S1. Tr. at 694–95. It showed no spinal canal or neural foraminal narrowing. Tr. at 695.

Plaintiff reported radiation of low back pain on the right to the lateral hip, buttock, and groin on June 21, 2012. Tr. at 688. She indicated her right leg pain was most bothersome. *Id.* Dr. Triana reviewed results of the CT

myelograms and noted Plaintiff's leg pain was likely coming from facet arthritis at L5–S1. *Id.* He referred Plaintiff to Patricia R. Grant, M.D. ("Dr. Grant"), for lumbar epidural steroid injections ("ESIs"). Tr. at 688–89.

Plaintiff presented to Dr. Grant for a pain management evaluation on July 3, 2012. Tr. at 678. She described pain that began in her right buttock and extended down her posterior thigh and calf to the heel. *Id.* She stated she had initially noticed the pain two months prior. *Id.* She reported numbness from her left elbow to her wrist and endorsed weakened grip. *Id.* Dr. Grant reviewed results of the CT myelograms. Tr. at 679. She observed Plaintiff to be "slow to rise to a stand," to have pain with even slight internal and external rotation of the right hip, to have painful resisted SLR, to be tender to direct compression of the lower lumbar facet joints, and to have diminished sensation in the right lateral thigh and calf. Tr. at 679–80. She instructed Plaintiff to remain off Plavix and aspirin and to return for an ESI the following Monday. Tr. at 680.

On July 9, 2012, Dr. Grant administered an L5–S1 interlaminar ESI. Tr. at 675–76.

On July 18, 2012, Plaintiff reported having obtained no relief from the ESI. Tr. at 672. She continued to describe right-sided low back pain that radiated down her posterior buttock and thigh and rated her pain as an eight.

Tr. at 672, 673. Dr. Grant administered right-sided medial branch blocks to the facet joints at L4–5 and L5–S1. Tr. at 672–73.

Plaintiff reported doing well from a cardiac standpoint on July 24, 2012. Tr. at 1116. She indicated she was engaging in moderate exercise, but denied weight loss. *Id.* Dr. Ijem noted no abnormal findings on exam. Tr. at 1118–19. He continued Plaintiff's medications. Tr. at 1119.

On August 22, 2012, Plaintiff reported little initial relief from the injection, but some improvement three weeks following its administration. Tr. at 687. She described pain in her lumbosacral area that ran through her buttocks, down the back of her legs, and occasionally to her right foot. *Id.* Dr. Triana recommended facet injections at L5–S1 and a caudal epidural. *Id.* Plaintiff indicated Percocet 5 mg was not helping, and Dr. Triana prescribed Norco 10/325 mg, continued Flexeril, and provided a lumbar corset brace. *Id.*

On October 30, 2012, Plaintiff complained of radiation of lower back pain on the right to the lateral hip, buttock, and groin. Tr. at 685. She reported little relief from the injections. *Id.* Dr. Triana prescribed Neurontin 300 mg, three times a day and continued Norco 10/325 mg. *Id.*

On December 20, 2012, Plaintiff described burning, cramping pain that radiated from the right side of her back to her lateral hip, buttocks, and groin. Tr. at 683. Dr. Triana explained Plaintiff would likely need lumbar fusion surgery in the future, but he attempted to treat her leg pain in the

interim with an increased dose of Neurontin. *Id.* He stopped Norco 10/325 mg, prescribed Percocet 5/325 mg, and increased Neurontin to two tablets at bedtime and one in the morning. *Id.*

Plaintiff underwent spirometry on December 27, 2012, that showed moderate obstruction, normal corrected DLCO, and no response to bronchodilators. Tr. at 1124.

Plaintiff was hospitalized at Georgetown Memorial Hospital from February 11 to 13, 2013, for chest pain. Tr. at 1808–10. Cardiac enzyme testing was negative and a sestamibi scan showed no evidence for inducible myocardial ischemia. Tr. at 1148. Chest x-rays, echocardiogram, and vascular ultrasound were all normal. *Id.* Her chest pain resolved, and Mudassir Akram, M.D., considered it to be non-cardiac in origin. Tr. at 1147, 1148.

On February 14, 2013, Plaintiff reported doing "fairly well" from a cardiac standpoint. Tr. at 1141. She complained of fatigue, malaise, nausea, and rare dizziness without syncope. *Id.* She indicated she was compliant with diet, but was engaging in minimal exercise. *Id.* Dr. Ijem noted Plaintiff had gained five pounds since her last visit and described her as morbidly obese. Tr. at 1141, 1143. The physical exam was otherwise normal. Tr. at 1143–44. Dr. Ijem counseled Plaintiff as to weight loss and continued her medications. Tr. at 1144.

Plaintiff presented to Dr. Taylor for an annual physical on February 22, 2013. Tr. at 1801. She complained of cramping pain in her left arm and leg. *Id.* Dr. Taylor noted normal findings on exam. Tr. at 1802–03.

Plaintiff reported no change in her asthma symptoms on February 26, 2013. Tr. at 1150. She indicated she required a rescue inhaler three times a week and was no longer using her CPAP because her face mask was causing irritation. *Id.* Dr. Young noted no abnormalities and assessed stable, moderate, persistent asthma. Tr. at 1152. He continued Plaintiff's medications, discussed weight loss, and ordered a repeat overnight sleep study. *Id.*

On March 28, 2013, Plaintiff reported her back pain was aggravated further when she was injured in a car accident in January. Tr. at 681. She said a Medrol Dosepak had provided some relief. *Id.* She continued to endorse right-sided back pain that radiated to her lateral hip, buttocks, and groin. *Id.* Dr. Triana noted that Plaintiff's CT scan showed facet arthritis at L5–S1, mostly on the right that correlated with her leg pain. *Id.* He indicated Plaintiff would need to lose more weight for him to consider proceeding with surgery. *Id.* Plaintiff said she was having difficulty exercising because of

school and work.[5] *Id.* Dr. Triana refilled Norco 10/325 mg for pain and instructed Plaintiff to follow up in six months. *Id.*

Plaintiff presented to Dr. Taylor with right arm pain and swelling on May 24, 2013. Tr. at 1798. Dr. Taylor noted positive spasms from the right brachioradialis muscle into the tendon at the index finger. Tr. at 1799. She assessed a muscle strain. *Id.*

Plaintiff underwent a sleep study on October 12, 2013, that showed moderate obstructive sleep apnea ("OSA"). Tr. at 1159. Her sleep was moderately fragmented by arousals associated with sleep disordered breathing. *Id.* Dr. Young recommended a CPAP titration sleep study and home CPAP therapy. *Id.*

Plaintiff presented to Grand Strand Regional Medical Center for shortness of breath associated with an asthma attack on October 31, 2013. Tr. at 701. Thomas J. Martel, M.D., ordered Albuterol and discharged Plaintiff with a diagnosis of acute asthma. Tr. at 703–04.

Plaintiff denied cardiac complaints on November 13, 2013. Tr. at 1175. Dr. Ijem encouraged diet and exercise. Tr. at 1178.

---

[5] Plaintiff testified that she briefly returned to work at Wal-Mart in 2013, prior to being terminated for absenteeism, and participated in work study while taking college courses. Tr. at 49. Her earnings record shows $3,614.04 from Wal-Mart in 2013. Tr. at 464. It also includes earnings from Horry Georgetown Technical College of $2,885.50 in 2013 and $456.75 in 2014. Tr. at 465. The ALJ concluded that work Plaintiff performed after her AOD was not substantial gainful activity. Tr. at 186.

Plaintiff complained of increased cough, dyspnea, and wheezing on November 20, 2013. Tr. at 1180. Dr. Young noted no abnormal findings on physical exam. Tr. at 1182. He encouraged CPAP compliance, discussed weight loss, continued Plaintiff's medication, and prescribed a Prednisone taper to be used if her symptoms failed to improve. Tr. at 1182–83.

Plaintiff was admitted to Georgetown Memorial Hospital from February 5 through 9, 2014, after presenting with left-sided tingling in her arm and hand. Tr. at 1789. Neurologist Philip Amodeo, M.D. ("Dr. Amodeo"), consulted on Plaintiff's case. Tr. at 1635. Plaintiff reported a left-sided headache with associated visual disturbance and numbness in all aspects of the left side of her face respecting the midline. Tr. at 1635, 1637. She had full strength in her upper extremity ("UE") and lower extremity ("LE"). *Id.* She reported decreased sensation to light touch in her left UE and LE. Tr. at 1638. Dr. Amodeo indicated the findings suggested possible migraine-associated paresthesia versus lacunar ischemic infarction versus functional somatoform complaints. *Id.*

On February 14, 2014, Plaintiff complained of a constant, shooting headache that was associated with blurred vision, dizziness, nausea, and numbness. Tr. at 1786. Dr. Taylor noted normal findings on exam. Tr. at 1787. She ordered x-rays of Plaintiff's cervical spine and referred Plaintiff to an ophthalmologist. Tr. at 1788.

On February 27, 2014, Plaintiff reported no change in asthma symptoms. Tr. at 1556. She complained of fatigue and migraines and admitted she had not been using her CPAP machine often. *Id.* Dr. Young noted prolonged expiratory phase, but otherwise normal findings on exam. Tr. at 1558–59. He encouraged Plaintiff to use her CPAP and to lose weight and continued her medications. Tr. at 1559.

Plaintiff followed up with Dr. Amodeo for evaluation of migraines on March 3, 2014. Tr. at 1552. She reported some hand weakness following discharge from the hospital. *Id.* Dr. Amodeo noted normal findings on exam. Tr. at 1555. He assessed migraine with aura. *Id.* He stopped Keppra, as it was not an effective treatment for migraines. *Id.* He prescribed Topamax and advised Plaintiff to start with 25 mg at bedtime and increase it to 50 mg at bedtime after three days. *Id.*

Plaintiff presented to orthopedic surgeon R. Marshall Hay for an initial assessment of right hip pain on April 21, 2014. Tr. at 1381. She endorsed right groin pain and right LE numbness and tingling. *Id.* She described increased pain upon driving, getting up and walking after sitting for an extended period, standing for an extended period, and climbing stairs. *Id.* Dr. Hay noted normal findings, aside from tightness in the right iliotibial band, tenderness to palpation ("TTP") over the right greater trochanter and along the iliotibial band, and discomfort in the right hip with extremes of abduction

and flexion/internal rotation. Tr. at 1382. He noted he had previously treated Plaintiff for carpal tunnel syndrome and performed a carpal tunnel release surgery. *Id.* Dr. Hay diagnosed trochanteric bursitis of the right hip. *Id.* He could not rule out a labral tear because Plaintiff could not undergo MRI, but he did not consider it to be a likely component of her discomfort. *Id.* He referred Plaintiff to physical therapy. *Id.*

On April 29, 2014, Plaintiff reported improvement in her migraines with only three since her last visit that lasted greater than four hours and had associated nausea and visual disturbance. Tr. at 1548. Dr. Amodeo noted normal findings on exam. Tr. at 1551. He increased Topamax to 75 mg at bedtime and prescribed Maxalt MLT 10 mg as needed. *Id.*

Plaintiff followed up with Dr. Taylor for osteoarthritis on May 23, 2014. Tr. at 1765. She reported she was asymptomatic. *Id.*

Plaintiff presented to orthopedic surgeon A. Mason Ahearn, M.D. ("Dr. Ahearn"), for an orthopedic consultative exam on June 4, 2014. Tr. at 1348–52. She described residual neck pain with left arm tingling that radiated into her fingers and median nerve palmar pain in her right hand with similar symptoms in the left hand. Tr. at 1350. She also complained of back and hip problems and rated her back pain as an eight. *Id.* She described left sciatic radiation into her feet. *Id.* She reported activities that included living alone, cooking, cleaning, driving a vehicle, pushing a cart to shop for groceries,

eating in restaurants and attending church twice a month, watching television, reading, using a computer for an hour-and-a-half a day, and socializing with family and a male friend. Tr. at 1350–51. Dr. Ahearn indicated Plaintiff was 5'1" tall and weighed 205 pounds. Tr. at 1351. He stated Plaintiff had normal gait and was able to walk on heels and toes and perform tandem walk. *Id.* He noted Plaintiff declined to squat because of back pain and got onto and off the exam table slowly, but without assistance. *Id.* He observed full cervical motion, full motion of all UE joints, good gross and fine manual dexterity, and no muscular, sensory, or reflex abnormalities. *Id.* He noted Spurling's test to the left induced left trapezius corner pain. *Id.* He found slight paralumbar muscular spasms and tenderness and left sciatic notch tenderness. *Id.* Plaintiff endorsed pain on SLR tests and tingling in the right great toe. *Id.* Dr. Ahearn found 1+, equal deep tendon reflexes ("DTRs"). *Id.* He noted abnormal range of motion ("ROM") of the lumbar spine with 30/90 degrees of flexion, 10/25 degrees of extension, and 10/25 degrees of lateral flexion. Tr. at 1348. He observed decreased knee flexion to 120/150 degrees on the left and 130/150 degrees on the right. *Id.* He stated Plaintiff's impairments appeared to be stable under medication. Tr. at 1352. He opined that Plaintiff would be limited to sedentary to light work without prolonged standing and walking, overhead reaching, bending, stooping, lifting over 20 pounds, and repeated climbing. *Id.*

Plaintiff presented to Douglas R. Ritz, Ph.D. ("Dr. Ritz"), for a consultative mental status exam ("MSE") on June 7, 2014. Tr. at 1354–57. She reported fluctuating depressive symptoms over many years because of physical illness and a history of crack addiction that ended in 2004. Tr. at 1354. She endorsed periods in which she remained in bed, avoided others, and neglected household chores and personal care, but said she would pull herself out of this state. *Id.* Dr. Ritz observed Plaintiff to demonstrate good grooming and hygiene, to have loud and expressive speech, to maintain good eye contact, to remain focused, and to provide a coherent history. Tr. at 1356. He noted Plaintiff's mood was sad and tearful at times and her affect was congruent. *Id.* He stated her thoughts were coherent, logical, and goal-directed. *Id.* He indicated Plaintiff endorsed no hallucinations or delusions and had good insight and judgment. *Id.* He stated Plaintiff could remember three of three words after a few minutes, made three errors on serial seven calculations, and scored 26/30 on the Mini-Mental State Exam, which was considered unimpaired. *Id.* He estimated Plaintiff had average cognitive skills. *Id.* He stated Plaintiff had "a low level of depression that would not prevent her from performing in a work-related setting." *Id.* He noted Plaintiff maintained her concentration without difficulty, maintained social interactions, and was able to avoid physical danger and handle funds. *Id.* He assessed dysthymic disorder. *Id.*

16

On June 10, 2014, Plaintiff reported three to four migraines per month that had improved with Topamax. Tr. at 1544. Dr. Amodeo noted normal findings on physical exam. Tr. at 1547. He assessed migraine without aura, continued Maxalt MLT 10 mg, and increased Topamax to 100 mg at bedtime. *Id.*

On June 11, 2014, state agency consultant Judith Von, Ph.D. ("Dr. Von"), reviewed the evidence, considered Listings 12.04 for affective disorders and 12.09 for substance addiction disorders, and assessed no restriction of activities of daily living ("ADLs") or episodes of decompensation and mild difficulties in maintaining social functioning and concentration, persistence, or pace. Tr. at 79–80. She concluded Plaintiff had mild depression that would not preclude employment. Tr. at 80.

On June 12, 2014, state agency medical consultant Angela Saito, M.D. ("Dr. Saito"), reviewed the evidence and provided the following physical residual functional capacity ("RFC") assessment: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds; frequently balance; no overhead reaching; and avoid concentrated exposure to hazards. Tr. at 81–84.

Plaintiff complained of fatigue and lightheadedness, but denied cardiac symptoms on June 17, 2014. Tr. at 1605. Dr. Ijem noted Plaintiff was morbidly obese, but cited no other abnormal findings. Tr. at 1608. He counseled Plaintiff on exercise and weight loss. Tr. at 1609.

On June 19, 2014, CT scans of Plaintiff's cervical and lumbar spine showed no evidence of hardware failure or loosening and no significant canal or foraminal compromise at C5–6; a broad posterior annular bulge with minimal ventral cord flattening at C4–5; a broad posterior annular bulge with mild ventral cord flattening and asymmetric soft tissue density in the left foraminal region greater than on the prior exam at C6–7; minimal annular bulge posteriorly with right foraminal narrowing secondary to asymmetric bulge and ligamentum flavum overgrowth and minimal facet spurring at L5–S1; and minor right foraminal narrowing at L4–5. Tr. at 1363–64.

On June 26, 2014, Plaintiff indicated physical therapy had improved her right lateral hip discomfort, but increased her neck and back pain. Tr. at 1379. She complained of a headache since undergoing the CT myelogram. *Id.* She described neck and back pain that was so severe that she could not sit, walk, or sleep without it increasing. *Id.* She said Motrin was worsening symptoms associated with gastric ulcers and Percocet was no longer helping. *Id.* Dr. Hay observed minimal tenderness over the trochanteric bursa with

some iliotibial band tightness. *Id.* He provided instructions on stretching exercises and refilled Neurontin 300 mg. *Id.*

Plaintiff complained of lower back pain on June 27, 2014. Tr. at 1757. Dr. Taylor noted normal findings on exam. Tr. at 1758–59. She recommended Plaintiff use a Velcro wrist splint for carpal tunnel syndrome. Tr. at 1760.

Plaintiff initially presented to Waccamaw Center for Mental Health ("WCMH") on July 18, 2014. Tr. at 1472. She was scheduled for an initial clinical assessment on August 1, 2014. *Id.*

Plaintiff presented to pain management specialist Ellen Rhame, M.D. ("Dr. Rhame"), for a new patient consultation on July 30, 2014. Tr. at 1418. She described low back pain that radiated into her right hip area and intermittent right LE pain that radiated into the bottom of her right foot. *Id.* She reported her pain was worsened by prolonged standing, lying in a supine position or on her right side, prolonged car rides, and cold weather. *Id.* She rated her pain as a seven, but indicated it had been a 10 over the prior week. *Id.* Dr. Rhame observed full ROM of Plaintiff's bilateral hips, ability to heel and toe walk without difficulty, positive bilateral Patrick's tests, TTP of the right sacroiliac joint and over the bilateral lumbar paraspinous areas, 5/5 bilateral LE strength, intact bilateral LE sensation to light touch, inability to obtain bilateral patellar and Achilles DTRs, absent Babinski's sign, and negative bilateral supine SLR. Tr. at 1419. She assessed lumbar spondylosis,

sacroiliitis, and lumbar disc displacement. Tr. at 1419–20. She started Nabumetone 500 mg twice a day and Tramadol HCl 50 mg every six hours, continued Flexeril 10 mg three times a day, recommended weight loss, increased Neurontin to 300 mg twice a day and 600–900 mg at bedtime, and advised Plaintiff to continue physical therapy exercises at home and to look into swimming pools in her area for exercise. Tr. at 1420. She also administered medial branch blocks at L2, L3, L4, and L5. *Id.* Dr. Rhame indicated she did not intend to prescribe opioids, as Plaintiff reported they had been minimally effective in the past and because they carried risks associated with prolonged use. *Id.*

Plaintiff returned to WCMH, where she met with Dorotheal C. Marsh, LMSW ("SW Marsh"), for an initial clinical assessment on August 1, 2014. Tr. at 1472–76. She reported feeling tired and frustrated with her illness and medications. Tr. at 1472. She said she felt depressed, wanted to lie in bed, and did not want to care for her hygiene. *Id.* She endorsed a history of alcohol and crack/cocaine abuse, but indicated she last used both in 2004. *Id.* She indicated she was involved in a drug and alcohol ministry through her church. Tr. at 1473. SW Marsh observed the following on MSE: neat, clean appearance; appropriate motor activity; cooperative attitude; tearful and appropriate affect; euthymic mood; loud speech; normal, appropriate, coherent, and relevant thought process; normal thought content; no evidence

of hallucinations or delusions; alert and oriented to person, place, time, and situation; able to make sound decisions; acknowledges and understands problems; intact memory; able to concentrate; and average fund of knowledge. Tr. at 1474–75. She assessed severe, recurrent major depressive disorder ("MDD") without psychotic features and a global assessment of functioning ("GAF")[6] score of 65.[7] Tr. at 1475. She stated Plaintiff would benefit from medication assessment and individual therapy. Tr. at 1476.

Plaintiff returned to Dr. Rhame for medial branch blocks at the bilateral L2, L3, L4, and L5 levels on August 7, 2014. Tr. at 1424.

Plaintiff complained of back pain on August 8, 2014, despite having received medial branch blocks the prior day. Tr. at 1742. Dr. Taylor increased Neurontin to 600 mg at bedtime. Tr. at 1743.

Plaintiff's pulmonary function testing was essentially normal on August 11, 2014. Tr. at 1602.

---

[6] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

[7] A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful interpersonal relationships." *DSM-IV-TR.*

Plaintiff presented to psychiatrist Richard C. Phelps, II, M.D. ("Dr. Phelps"), at WCMH for an initial psychiatric medical assessment on September 2, 2014. Tr. at 1470–71. She complained of poor sleep with frequent awakening, anhedonia, isolation, irritability, guilt, and poor focus and concentration. Tr. at 1470. She endorsed stressors that included multiple medications, back pain, and situational problems. *Id.* She sought therapy, but did not desire medications, as she felt she was already on too many. *Id.* Dr. Phelps observed mostly normal mental status, aside from depressed affect and fair insight and judgment. *Id.* He diagnosed moderate, recurrent MDD and assessed a GAF score of 60.[8] *Id.* He indicated he would respect Plaintiff's autonomy as to medication, and Plaintiff said she would consider medication if her symptoms worsened or remained the same after initiation of therapy. *Id.*

Plaintiff met with SW Marsh to develop a treatment plan on September 4, 2014. Tr. at 1469. She followed up for individual therapy on a regular basis throughout the relevant period and often discussed with SW Marsh problems in her relationships with her husband and children. *See* Tr. at 1433–67, 2317–34, 2399.

---

[8] A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV-TR.*

On September 11, 2014, Plaintiff reported stable asthma symptoms, but endorsed fatigue, migraines, and pain in her back and hip that was keeping her awake. Tr. at 1540, 1543. She complained of difficulty using her CPAP machine because of dryness. Tr. at 1540. Dr. Young noted prolonged expiratory phase, but otherwise normal findings on physical exam. Tr. at 1542–43. He encouraged Plaintiff to use her CPAP and lose weight and continued her medications. Tr. at 1543.

On September 11, 2014, state agency medical consultant James Upchurch, M.D. ("Dr. Upchurch"), reviewed the record and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds; frequently balance; no overhead reaching; avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, and poor ventilation; and avoid even moderate exposure to hazards. Tr. at 117–20.

On September 19, 2014, Plaintiff described back pain that radiated to her right LE, but stopped at the knee. Tr. at 1414. She endorsed numbness in all toes on the right. *Id.* She reported 80% relief from bilateral medial branch blocks until two weeks prior when she fell on her hip and exacerbated her

back pain. *Id.* She indicated she had recently joined a gym and had attended eight physical therapy sessions. *Id.* Dr. Rhame noted Plaintiff was uncomfortable and demonstrated TTP over the bilateral lumbar paraspinous areas. Tr. at 1415. She was unable to obtain bilateral patellar and Achilles DTRs, but otherwise noted normal findings. *Id.* She prescribed a transcutaneous electrical nerve stimulation ("TENS") unit and Tramadol HCl 50 mg, refilled Plaintiff's other medications, and repeated medial branch blocks. Tr. at 1416.

On September 29, 2014, a second state agency consultant, Janet Telford-Tyler, Ph.D. ("Dr. Telford-Tyler"), reviewed the evidence, considered Listing 12.04, and found no restriction of ADLs or episodes of decompensation and only mild difficulties in maintaining social functioning and concentration, persistence, or pace. Tr. at 115–16.

Plaintiff reported relatively stable migraines on October 2, 2014. Tr. at 1536. Neurologist Mark Grinman, M.D. ("Dr. Grinman"), noted normal findings on physical exam. Tr. at 1539. He encouraged Plaintiff to engage in an exercise program and continued her medication. *Id.*

Plaintiff reported poor sleep, crying spells, isolation, anhedonia, and irritability on October 17, 2014. Tr. at 1463. Dr. Phelps noted constricted affect and fair insight and judgment, but otherwise normal findings on MSE. *Id.* He prescribed Prozac 10 mg. *Id.*

Dr. Rhame administered medial branch blocks at the bilateral L2, L3, L4, and L5 levels on October 29, 2014. Tr. at 1423.

On December 5, 2014, Plaintiff complained of low back pain that had worsened after she sustained a fall two-to-three months prior. Tr. at 1728. Dr. Taylor prescribed Metformin HCL 500 mg for diabetes. Tr. at 1729.

On December 17, 2014, Plaintiff reported pain in her back that radiated to the back of her right thigh and knee. Tr. at 1410. She endorsed intermittent radiation and numbness in her right great toe. *Id.* She reported some relief from medial branch blocks and use of a TENS unit. *Id.* She rated her pain as a five, but indicated it had averaged an eight over the prior week. Tr. at 1411. Dr. Rhame observed full ROM of the bilateral hips, negative Patrick's test, ability to heel and toe walk without difficulty, TTP over the bilateral lumbar paraspinous areas, 5/5 bilateral LE strength, intact LE sensation to light touch, and negative bilateral supine SLR. *Id.* She was unable to obtain bilateral patellar and Achilles DTRs. *Id.* She refilled Plaintiff's medications, encouraged her to continue physical therapy exercises and use her TENS unit, and planned to proceed with a radiofrequency procedure. Tr. at 1412.

On January 8, 2015, Plaintiff reported more frequent breakthrough headaches over the prior month and near daily headaches over the prior couple of weeks. Tr. at 1532. Dr. Grinman noted normal findings on physical

exam. Tr. at 1534–35. He increased Topamax to 50 mg in the morning and 100 mg at bedtime. Tr. at 1535.

Dr. Rhame performed radiofrequency lesioning of the right L2, L3, L4, and L5 medial branches on January 15, 2015. Tr. at 1422.

Plaintiff reported continued sadness, depression, irritability, anhedonia, isolation, poor sleep, and crying spells on January 27, 2015. Tr. at 1458. She admitted she had not started Prozac because she was reluctant to take psychiatric medications. *Id.* Dr. Phelps noted poor judgment and fair insight, but otherwise normal findings on MSE. *Id.* He indicated he would respect Plaintiff's autonomy on whether to start Prozac and that she should remain in individual therapy to address social circumstances with her grown children. *Id.* He assessed a GAF score of 65 and provided samples of Prozac. *Id.*

Plaintiff presented to Dr. Taylor for diabetes follow up on January 30, 2015. Tr. at 1725. She reported well-controlled symptoms with her current treatment regimen. *Id.* Dr. Taylor advised Plaintiff to continue to follow a diet and engage in low-impact aerobic exercise. Tr. at 1726–27.

On February 19, 2015, Plaintiff reported some improvement in her headaches after increasing Topamax, but continued to experience two to three migraines per week. Tr. at 1528. Dr. Grinman noted normal findings on

physical exam. Tr. at 1530–31. He increased Topamax to 100 mg twice a day. Tr. at 1531.

Plaintiff complained of a barking cough, congestion, sore throat, chest pain, hoarseness, and extreme fatigue on February 24, 2015. Tr. at 1524. Dr. Young observed Plaintiff to demonstrate a prolonged expiratory phase on physical exam. Tr. at 1526–27. He ordered a chest x-ray and a Methylprednisolone injection and prescribed Levaquin and a Prednisone taper. Tr. at 1527.

On February 27, 2015, Plaintiff reported 50% improvement in back pain and denied leg radiation. Tr. at 1406. She rated her pain as a five. Tr. at 1407. She indicated water aerobics and a TENS unit provided some pain relief. Tr. at 1407. Dr. Rhame observed full ROM of the bilateral hips, negative bilateral Patrick's test, mild TTP over the right lumbar paraspinous areas, 5/5 bilateral LE strength, intact sensation to light touch throughout the LEs, and negative SLR. Tr. at 1407. She was unable to obtain bilateral patellar and Achilles DTRs. *Id.* She refilled Plaintiff's medications. *Id.*

Plaintiff was hospitalized at Georgetown Memorial Hospital from March 2, through March 6, 2015, for an asthma exacerbation with respiratory distress. Tr. at 1711–13.

Plaintiff complained of worsening wheezing and cough on March 10, 2015. Tr. at 1520. She reported fatigue and migraines. *Id.* Dr. Young

observed Plaintiff to demonstrate a prolonged expiratory phase. Tr. at 1522–23. He noted Plaintiff was finishing a Prednisone taper and should continue to use Singulair, Advair, Combivent, and Albuterol. Tr. at 1523.

On March 13, 2015, Plaintiff reported she was able to perform ADLs and work and was not anxious, depressed, or frustrated, despite her illness. Tr. at 1704. Dr. Taylor noted normal findings on exam. Tr. at 1705–06.

On April 2, 2015, Plaintiff reported improvement in her headaches after increasing Topamax. Tr. at 1516. She indicated Topamax caused a tingling sensation, but denied other side effects. *Id.* Dr. Grinman noted normal strength, tone, DTRs, and sensation in all extremities, as well as normal gait and posture. Tr. at 1518–19. He continued Topamax at the same dose. Tr. at 1819.

Plaintiff complained to Dr. Taylor of mild tingling over both sides of her face on May 8, 2015. Tr. at 1696. She indicated the symptoms worsened after she took a new medication. *Id.* Dr. Taylor noted normal findings on exam. Tr. at 1697–98. She assessed temporomandibular joint disorder. Tr. at 1698.

On May 19, 2015, Plaintiff reported increased wheezing and cough and noted she was using her rescue inhaler six times a week. Tr. at 1511. She endorsed fatigue and daytime somnolence and reported difficulty using her CPAP machine because her mask was uncomfortable. *Id.* Dr. Young noted no abnormal findings on physical exam. Tr. at 1513–14. He ordered pulmonary

function tests and prescribed Azithromycin and a Prednisone taper for Plaintiff to keep on hand. Tr. at 1514.

Plaintiff followed up with Dr. Ijem and denied cardiac symptoms on June 25, 2015. Tr. at 1577. Dr. Ijem noted normal findings on exam. Tr. at 1580. He performed a pacemaker check and counseled Plaintiff on exercise and the need for weight loss. *Id.*

On July 2, 2015, Plaintiff reported a recent exacerbation of migraines that were occurring as often as daily. Tr. at 1507. Dr. Grinman noted normal muscle strength, tone, DTRs, sensation, and gait on physical exam. Tr. at 1509–10. He increased Topamax to 150 mg twice a day. Tr. at 1510.

Plaintiff also presented to Dr. Taylor for her annual physical on July 2, 2015. Tr. at 1688. She complained of right flank pain that had gradually increased over the prior six months. *Id.* She reported aching over her bilateral LEs that was associated with numbness and tingling and tenderness to touch. *Id.* Dr. Taylor noted normal findings on exam. Tr. at 1689–90.

On July 14, 2015, Plaintiff complained of depression, isolation, tearfulness, poor sleep quality with frequent awakening, anhedonia, and guilt. Tr. at 1449. She reported having taken only two Prozac pills since her last visit. *Id.* Dr. Phelps observed Plaintiff to demonstrate depressed mood and poor insight and judgment on MSE. *Id.* He assessed a GAF score of 60

and advised Plaintiff to take Melatonin 5 mg at bedtime, stop napping during the day, and restart Prozac. *Id.*

On July 24, 2015, Plaintiff reported pain in her back, posterior right LE, and right great toe. Tr. at 1403. She described intermittent numbness and tingling in her right distal LE that had been present for years and radiating pain to her heel and toe since April 2015. *Id.* She indicated radiofrequency lesioning had provided 50% relief in back pain that had permitted her to start line dancing, but noted her pain had increased several weeks prior and required she restart Tramadol and stop water aerobics. *Id.* She rated her pain as a nine. *Id.* Dr. Rhame noted negative bilateral Patrick's test, mild TTP over the right lumbar paraspinous areas, 5/5 bilateral LE strength, bilateral LE sensation to light touch except on the right heel, trace bilateral patellar DTRs, inability to obtain Achilles DTRs, and negative SLR test. Tr. at 1404. She refilled Plaintiff's medications, encouraged her to continue exercise and use her TENS unit, and scheduled radiofrequency lesioning. Tr. at 1404–05. She noted Plaintiff had lost over 20 pounds over the prior year and encouraged her to restart water aerobics. Tr. at 1405.

On September 1, 2015, Plaintiff complained of fatigue and daytime somnolence and indicated she was unable to use her CPAP machine for the entire night because the mask was uncomfortable. Tr. at 1503. She reported using her rescue inhaler three times a week. *Id.* Dr. Young noted normal

findings on physical exam. Tr. at 1505–06. He assessed Plaintiff's asthma as stable and encouraged her to use her CPAP machine and a nebulizer with Albuterol Tr. at 1506.

Plaintiff presented to Donna Orvin, M.D. ("Dr. Orvin"), for psychiatric medical assessment on September 23, 2015. Tr. at 1445. She reported sleeping only three to four hours during the night and dozing for another one to two hours during the day. *Id.* She denied taking Prozac regularly. *Id.* She complained of irritability, frustration, racing thoughts, and feeling overwhelmed, but endorsed no benefit from psychiatric medications. *Id.* Dr. Orvin noted fair insight and judgment and mild impairment to recent memory, attention, and concentration on MSE. *Id.* She discontinued Prozac because Plaintiff was on multiple other medications and noted that she had some symptoms that could be associated with mild bipolar disorder, but were not definitive. Tr. at 1446.

On October 27, 2015, Plaintiff reported she had cancelled her radiofrequency procedure after noticing improvement upon taking Tramadol and Flexeril as scheduled, as opposed to as needed. Tr. at 1400. She continued to endorse low back pain that shifted from the right to the left, but denied radicular pain and numbness. *Id.* Dr. Rhame noted Patrick's test was negative on the left and positive on the right. Tr. at 1401. She observed mild TTP over the bilateral lumbar paraspinous areas, 5/5 bilateral LE strength,

31

and intact LE sensation to light touch. *Id.* She refilled Plaintiff's medications and recommended she continue to use a TENS unit, return to the gym or water aerobics, and try to lose weight. *Id.*

On December 16, 2015, Plaintiff reported decreased irritability and more stable mood since her neurologist increased Topamax. *Id.* She endorsed some word-finding problems. Tr. at 1442. Dr. Orvin described Plaintiff as having a guarded attitude, tangential thought process, angry and irritable mood, fair insight, and mild impairment to recent memory, attention, and concentration on MSE. *Id.*

Plaintiff also followed up with Dr. Grinman on December 16, 2015. Tr. at 1498. She reported decreased frequency and severity of migraines after increasing Topamax. *Id.* Dr. Grinman noted normal findings on physical exam, including normal bilateral UE and LE strength and tone, normal and symmetrical DTRs in all extremities, intact sensation, and normal gait and posture. Tr. at 1500–01. He informed Plaintiff that he would be leaving the practice and advised her to follow up with her primary care physician for a referral to another neurologist. Tr. at 1501. He continued Topamax at the same dose. *Id.*

Plaintiff complained of new pain in her hands on January 26, 2016. Tr. at 1397. She described pain throughout her body and said she felt as if she were retaining fluid. *Id.* She reported using her TENS unit and requested

medication refills. *Id.* She rated her pain as an eight. *Id.* Dr. Rhame noted mild TTP over Plaintiff's bilateral lumbar paraspinous areas that was reproduced with axial loading maneuvers. Tr. at 1398. She noted full ROM in Plaintiff's neck and shoulders, 5/5 bilateral LE strength, and intact sensation to light touch throughout the bilateral UEs and LEs. *Id.* She increased Nabumetone to 750 mg twice a day, refilled Plaintiff's other medications, and encouraged Plaintiff to use her TENS unit, return to water aerobics, and lose weight. *Id.*

On February 15, 2016, Plaintiff complained of aching joint pain throughout her body, particularly in her bilateral hands and hips. Tr. at 1673. Dr. Taylor assessed myalgia and ordered lab work. Tr. at 1675.

On March 22, 2016, Plaintiff reported decreased inflammation with the increased dose of Nabumetone. Tr. at 1394. She complained of some pain in the joints in her thumb area. *Id.* She said she was attending water aerobics and using a TENS unit as needed. *Id.* She rated her pain as a seven. *Id.* Dr. Rhame noted positive Patrick's test on the left, but no other abnormalities on physical exam. Tr. at 1395. She decreased Nabumetone from 750 to 500 mg, refilled Plaintiff's other medications, encouraged her to continue water aerobics, and referred her to a rheumatologist. Tr. at 1395–96.

Plaintiff complained of aching left thumb pain on April 1, 2016. Tr. at 1670. Dr. Taylor assessed polyarthritis. Tr. at 1672.

Plaintiff complained of a productive cough and tan sputum on May 3, 2016. Tr. at 1492. Abbie Shelley, APRN ("NP Shelley"), assessed acute asthmatic bronchitis and prescribed antibiotics and Prednisone. Tr. at 1495.

Plaintiff was hospitalized at Georgetown Memorial Hospital from May 16, through May 19, 2016, after she presented to the emergency room with chest pain, shortness of breath, and cough and failed to improve after medications were administered. Tr. at 1664. On May 18, 2016, Thomas M. Chandler, M.D., reviewed a chest x-ray, examined Plaintiff, and assessed acute exacerbation of chronic asthma. Tr. at 1630.

Plaintiff complained of numbness on the left side of her face on May 24, 2016. Tr. at 1391. She indicated improved joint and back pain and rated her pain as a four. *Id.* She reported using her TENS unit. *Id.* Dr. Rhame was unable to obtain DTRs in the bilateral biceps, triceps, brachioradialis, bilateral patellae, and bilateral Achilles. Tr. at 1392. She noted positive Patrick's test on the right, but the exam was otherwise normal. *Id.* She refilled Plaintiff's medications. Tr. at 1392–93.

On May 26, 2016, Plaintiff complained of chest tightness, fatigue, and left facial tingling and numbness. Tr. at 1657. She indicated she felt uncomfortable, despite having completed an antibiotic. *Id.* Dr. Taylor noted normal findings on exam. Tr. at 1659. She prescribed Albuterol. *Id.*

On June 2, 2016, Plaintiff complained of a two-week history of productive cough with tan sputum. Tr. at 1487. NP Shelley instructed Plaintiff to use her nebulizer with Albuterol and to take Mucinex 1200 mg twice a day. Tr. at 1490.

Plaintiff complained of increased stressors on June 7, 2016. Tr. at 1435. She endorsed sleep disturbance, feeling tired, poor energy, decreased concentration, and some word-finding difficulty. *Id.* She opted not to start a low-dose psychiatric medication. *Id.* Debra White, M.D. ("Dr. White"), noted anxious mood, but not other abnormal findings on MSE. *Id.*

Plaintiff presented to R. Morgan Stuart, M.D. ("Dr. Stuart"), for a neurosurgical consultation on July 1, 2016. Tr. at 1652. She complained of neck pain and worsening left UE radicular pain and paresthesia over the prior six months. *Id.* Dr. Stuart noted mild paraspinal tenderness on cervical exam, 5/5 motor strength, 1+ reflexes, and normal tone. *Id.* He reviewed nerve conduction studies that showed left median neuropathy consistent with carpal tunnel syndrome. *Id.* He assessed cervical radiculopathy, cervical spondylosis, and cervicalgia and referred Plaintiff to physical therapy. *Id.*

Plaintiff presented to Dr. Ijem for annual cardiac follow-up on July 7, 2016. Tr. at 1570. She denied cardiac symptoms. *Id.* Dr. Ijem noted normal findings on exam. Tr. at 1573. He checked Plaintiff's pacemaker, and it showed normal function. Tr. at 1575.

On July 26, 2016, Plaintiff reported having fallen on her right hip two weeks prior while at church. Tr. at 1388. She endorsed numbness of both feet and toes that had begun a week prior and worsening numbness in her left arm that had begun a month prior. *Id.* She reported pain in her legs with standing and walking, but said she obtained little pain relief upon sitting. *Id.* She rated her pain as a 10 over the prior week. *Id.* Dr. Rhame observed full ROM of Plaintiff's bilateral hips, TTP in the bilateral lumbosacral area, mild pain with axial loading maneuvers, 5/5 bilateral LE strength, intact sensation to light touch in the bilateral LEs, negative SLR, absent DTRs at the right patella, and 1+ DTRs at the left patella. Tr. at 1389. She assessed spondylosis of the lumbar region without myelopathy or radiculopathy, arthritis pain, sacroiliitis, lumbar disc displacement without myelopathy, and cervical radiculopathy. Tr. at 1389–90. She refilled Gralise 600 mg and Nabumetone 500 mg and started Tramadol 50 mg. *Id.* She authorized a four-month disability placard, but explained to Plaintiff that a permanent placard was not indicated, as she was able to ambulate reasonably well. Tr. at 1390.

Plaintiff reported stable asthma symptoms and using her rescue inhaler three times a week on July 28, 2016. Tr. at 1482. She complained of difficulty using her CPAP machine that led to daytime somnolence and fatigue. *Id.* She denied engaging in regular exercise and said she felt short of breath during mild exertion. *Id.* NP Shelley noted obesity and diminished

36

breath sounds, but no other abnormal findings on exam. Tr. at 1484–85. She continued Plaintiff's prescriptions for Advair and Singular, encouraged her to use her CPAP machine nightly, and authorized a handicap placard. Tr. at 1485.

Plaintiff returned to Dr. Taylor for an annual physical on September 8, 2016. Tr. at 1648. She described aching, cramping, and tingling pain in her face and left shoulder, arm, elbow, hand, leg, and foot. *Id.* She also complained of headaches. *Id.* She reported her symptoms worsened with activity or movement. *Id.* Dr. Taylor noted normal findings on exam. Tr. at 1650. She ordered blood work, a mammogram, a bone density test, and urinalysis. Tr. at 1651. She encouraged Plaintiff to continue her current drug regimen, to follow a low fat, low salt, high fiber, low caffeine, and vitamin-rich diet, and to engage in low impact aerobic exercise. *Id.*

On September 21, 2016, Plaintiff reported having sustained a recent injury to her left shoulder after grabbing the railing with her left UE while falling down the stairs. Tr. at 2243. She complained of increased left shoulder pain and complete numbness in her left hand following the injury. *Id.* She also endorsed numbness and tingling in her left foot and said physical therapy was not helpful and was aggravating her pain. *Id.* Kathryn Gonzalez, PA-C ("PA Gonzalez"), noted 5/5 motor strength in the bilateral UEs, mild paraspinal tenderness to the cervical spine, intact sensation to light touch in

the UEs, mild difficulty with tandem walking, normal tone, 1+ bilateral triceps and radial reflexes, and negative Hoffman's sign and ankle clonus. *Id.* She suggested ordering a CT myelogram, but Plaintiff declined and agreed to proceed with additional physical therapy. *Id.*

Plaintiff was hospitalized at Georgetown Memorial Hospital from September 26 through 30, 2016, after an acute onset of dizziness, blurred vision, and unsteady gait. Tr. at 1889. She demonstrated signs and symptoms of acute cerebellar stroke. *Id.* CT scans of her head were unremarkable and she could not undergo magnetic resonance imaging ("MRI") to confirm a stroke because of her implanted pacemaker. *Id.* However, the consulting neurologist assessed probable stroke. Tr. a 1889–90. Plaintiff was released with home health services for physical and occupational therapy. Tr, 1934–87.

On October 4, 2016, Plaintiff endorsed baseline symptoms of intermittent dyspnea and wheezing and reported using a rescue inhaler three times a week. Tr. at 2236. Dr. Young noted obesity and diminished breath sounds on physical exam. Tr. at 2239. He instructed Plaintiff to continue to use her CPAP machine at night and a nebulizer with Albuterol four times a day and refilled Singulair. *Id.*

Plaintiff underwent osteoporosis screening on October 13, 2016, that showed osteoporosis in the lumbar spine and osteopenia in the hips and

distal left forearm. Tr. at 2482. The scan showed a significant decrease in Plaintiff's bone density of 10.8% since a prior scan in 2012. *Id.*

Plaintiff complained of dizziness and headache on October 14, 2016. Tr. at 2232. She indicated Meclizine provided no relief. *Id.* Dr. Taylor told Plaintiff to stop taking Nabumetone and prescribed Fosamax for osteoporosis. Tr. at 2235.

On October 19, 2016, Plaintiff presented to Christine Anne Holmstedt, D.O. ("Dr. Holmstedt"), at the MUSC Comprehensive Stroke and Cerebrovascular Clinic for evaluation. Tr. at 2228. She reported feeling unsteady on her feet. *Id.* Dr. Holmstedt observed normal bulk and tone, 5/5 motor strength, 2+ and symmetric reflexes, wide-based gait, and normal coordination. Tr. at 2230. She noted intact sensation to light touch throughout, but "slow in all extremities." *Id.* She indicated Plaintiff was able to carry out all usual activities, despite some symptoms. *Id.* She increased Lipitor and encouraged Plaintiff to engage in at least 30 minutes of moderate exercise three-to-five times per week. Tr. at 2231.

Plaintiff reported unchanged pain in her neck and left UE on November 4, 2016. Tr. at 2225. She indicated the stroke had affected her balance and vision. *Id.* Dr. Stuart observed 5/5 motor strength in the bilateral UEs. *Id.* He ordered additional physical therapy. *Id.*

On November 8, 2016, Plaintiff complained of left neck and shoulder pain that radiated through her left arm to the area below her elbow. Tr. at 2221. She endorsed numbness in her face and in the fingers of her left hand and intermittent numbness in her legs, feet, and toes. *Id.* She complained of vertigo and felt like Fosamax intensified her pain. *Id.* She rated her pain as a five. *Id.* Dr. Rhame observed TTP over Plaintiff's right lumbar paraspinous area, full ROM of her neck and shoulders, 5/5 bilateral UE strength, and intact sensation to light touch throughout the bilateral UEs. Tr. at 2222. She refilled Plaintiff's medications and noted Plaintiff might benefit from a rheumatology consultation. Tr. at 2223.

Plaintiff communicated her desire to avoid psychiatric medications during a visit with Dr. White on December 15, 2016. Tr. at 2329. Dr. White noted normal findings on MSE and assessed unspecified depressive disorder. *Id.*

On January 6, 2017, Plaintiff reported improved symptoms in her neck and left UE with use of Omega 3 XL. Tr. at 2218. She endorsed only mild pain along the lateral aspect of her left UE. *Id.* PA Gonzalez noted 5/5 motor strength, no cervical muscle atrophy, mild paraspinal tenderness, no paravertebral spasm, and intact sensation to light touch. *Id.* She referred Plaintiff to physical therapy for treatment of left radicular arm pain and paresthesia. *Id.*

Plaintiff reported no pain on January 24, 2017. Tr. at 2368. She indicated she was taking Omega 3 XL that had resolved her joint pain and numbness. *Id.* Dr. Rhame noted normal findings on exam. Tr. at 2369. She refilled Plaintiff's medications and prescribed Flexeril 10 mg. *Id.*

On February 24, 2017, Plaintiff complained of side effects from Fosamax that included fatigue, nausea, and UE and LE pain and weakness. Tr. at 2215. Dr. Taylor instructed Plaintiff to continue the current drug regimen and said she would investigate injectable medications for osteoporosis. Tr. at 2217.

On May 2, 2017, Plaintiff reported unchanged back pain and indicated she had experienced an episode of numbness in her face and hands two weeks prior that had resolved on its own. Tr. at 2364. She stated Omega 3 XL was no longer effective. *Id.* She rated her pain as a six. *Id.* Dr. Rhame noted normal findings on exam. Tr. at 2365. She refilled Plaintiff's medications. *Id.*

Plaintiff described aching and gnawing pain in her bilateral fingers and wrists on May 26, 2017. Tr. at 2211. She also endorsed joint pain, stiffness, and swelling. *Id.* Dr. Taylor noted normal findings on exam and continued Plaintiff's medication regimen. Tr. at 2213–14.

On June 2, 2017, Plaintiff reported physical therapy had only provided a temporary benefit. Tr. at 2208. She described a recent episode in which she developed numbness and tingling in her face that radiated into her neck and

left UE and lasted for the entire day. *Id.* She indicated she was only sleeping for two to three hours because of her pain. *Id.* She described increased pain and paresthesia that were constant, moderate-to-severe, and radiated from her neck into the lateral aspect of her UEs and to her hands and fingers. *Id.* She denied benefits from Gralise and Tramadol. *Id.* PA Gonzalez noted 5/5 motor strength, intact sensation to light touch, normal tone, 2+ bilateral triceps and biceps reflexes, and absent Hoffman's sign. Tr. at 2209. She prescribed Tramadol HCl 50 mg every six hours and referred Plaintiff for x-rays and a CT myelogram of the cervical spine. Tr. at 2210.

On August 4, 2017, Plaintiff complained of neck pain that radiated into her bilateral UEs and caused numbness and tingling and indicated difficulty establishing treatment with a pain management provider since Dr. Rhame moved out of state. Tr. at 2205. Dr. Stuart assessed arthritis pain and cervical spondylosis with radiculopathy. *Id.* He informed Plaintiff that the CT myelogram did not support further surgical intervention, refilled Tramadol HCl, and indicated he would help her to find a pain management physician. *Id.*

Plaintiff followed up with Dr. Ijem for annual pacemaker interrogation on August 15, 2017. Tr. at 2202. She denied cardiac symptoms. *Id.* She reported having experienced palpitations one month prior while at church and endorsed fatigue that was likely associated with poor sleep. *Id.* She

described having awakened with edema on three days over the prior two months, but noted it resolved on its own. *Id.* Dr. Ijem noted Plaintiff's pacemaker was functioning appropriately. *Id.* He encouraged Plaintiff to engage in good sleep hygiene and continued her medications. Tr. at 2203.

Plaintiff presented to pain management specialist Stephen Q. Parker, M.D. ("Dr. Parker"), on September 21, 2017. Tr. at 2103. She complained of low back pain that interfered with her ability to perform household chores and ADLs. *Id.* She rated her pain as an eight and described it as persistent, discomforting, throbbing, and concentrated in her lower back. *Id.* She indicated her pain was exacerbated by ADLs, flexion, twisting, and walking. *Id.* She endorsed generalized weakness, inability to climb stairs without stopping, difficulty walking, gait disturbance, anxiety, and muscle weakness. Tr. at 2105. Dr. Parker noted the following on exam: back pain with bilateral femoral stretch; antalgic gait; increased muscle tone in the LEs and lumbar paraspinals; lumbar spasm; paraspinous tenderness; pain with extension and rotation of the lumbar spine; pain with active ROM of the lumbar spine and bilateral hips; pain with passive ROM of the right hip; normal active and passive ROM of the knees and ankles; and normal LE strength. Tr. at 2106. He prescribed Tramadol HCl 50 mg twice a day, as needed. *Id.* He sought authorization from Plaintiff's insurance provider to proceed with radiofrequency lesioning. Tr. at 2103.

On September 29, 2017, Plaintiff complained of constant aching pain and swelling in her joints. Tr. at 2198. Dr. Taylor refilled Neurontin 600 mg. Tr. at 2200.

Plaintiff rated her lumbar pain as an eight on October 18, 2017. Tr. at 2100. She reported difficulty walking. Tr. at 2101. Dr. Parker prescribed Tramadol HCl 50 mg twice a day, as needed, and one Valium 10 mg tablet to be taken prior to the scheduled radiofrequency lesioning procedure. *Id.*

Plaintiff presented to Dr. Taylor for her annual physical on November 9, 2017. Tr. at 2193. She weighed 176 pounds and was 5'3" tall with a body mass index of 31.24 kg/m.[2] Tr. at 2195. Dr. Taylor noted normal findings on physical exam. Tr. at 2195–96. She continued Plaintiff's current medication regimen and referred her to an ophthalmologist. Tr. at 2196.

Dr. Parker administered therapeutic nerve blocks from L3 to S1 and performed right-sided radiofrequency lesioning on November 13, 2017. Tr. at 2097–99.

On November 20, 2017, Plaintiff followed up with Dr. Parker and reported 50% pain relief from right-sided radiofrequency lesioning. Tr. at 2095. She rated her pain as a seven after performing household chores and said she could not stand for long periods. *Id.*

Plaintiff rated her low back pain as an eight on November 29, 2017. Tr. at 2092. She endorsed generalized weakness, difficulty walking, and muscle

weakness. Tr. at 2093–94. Tim Montague-Smith, PA-C ("PA Montague-Smith"), prescribed Tramadol HCl 50 mg twice a day, as needed. Tr. at 2094.

Dr. Parker administered therapeutic nerve blocks at Plaintiff's L3 to S1 levels on December 11, 2017. Tr. at 2089–91.

Plaintiff was hospitalized for influenza at Georgetown Memorial Hospital from December 13 to December 15, 2017. Tr. at 2424. Upon admission, she demonstrated shortness of breath and wheezing. *Id.* Her respiratory function improved over the course of her hospitalization. *Id.*

Plaintiff complained of asthma exacerbation that often affected her activity on January 2, 2018. Tr. at 2186. She endorsed chest tightness, nonproductive cough, dyspnea, and nasal congestion. *Id.* Dr. Taylor refilled Topamax and instructed Plaintiff to treat with a nebulizer three times a day and use her inhaler every four-to-six hours as needed. Tr. at 2189.

On January 5, 2018, Plaintiff described lumbar pain that was mostly on her right side. Tr. at 2085. She rated her pain as a nine. *Id.* She endorsed difficulty walking, paresthesia, and muscle weakness. Tr. at 2087. Dr. Parker noted the following on physical exam: back pain with right femoral stretch; antalgic gait; increased LE and lumbar paraspinal muscle tone; lumbar spasms; paraspinous tenderness; pain with extension and rotation of the lumbar spine; limited active ROM of the lumbar spine; pain with active ROM of the lumbar spine and bilateral hips; pain with passive ROM of the right

hip; normal active and passive ROM of the ankles; and normal strength in the LEs. *Id.* He prescribed Hydrocodone-Acetaminophen 10/325 mg. *Id.*

On January 29, 2018, Plaintiff reported using her CPAP machine for four-to-six hours per night. Tr. at 2169. She complained of difficulty falling and staying asleep, generalized musculoskeletal pain, and mild dyspnea on exertion. *Id.* Dr. Young indicated Plaintiff had moderate persistent asthma without complications. Tr. at 2170. He urged CPAP compliance and continued Plaintiff's medications. *Id.*

Plaintiff rated her lumbar pain as an eight on January 31, 2018. Tr. at 2081. She indicated Hydrocodone was ineffective. *Id.* She endorsed difficulty walking, paresthesia, and muscle weakness. Tr. at 2083. Dr. Parker prescribed Valium 10 mg and Oxycodone HCl 10 mg. *Id.*

Plaintiff underwent CT myelogram of the lumbar spine on February 2, 2018, that showed mild degenerative changes of the facet joints at L2–3 and L3–4, minimal spurring off of the anterior margin of L4, ligamentum flavum and facet joint hypertrophy at L4–5, and degenerative facet joint changes and hypertrophy at L5–S1, but indicated no marked spinal stenosis or foraminal stenosis. Tr. at 2110.

Ophthalmologist Carole M. Young, M.D., diagnosed bilateral cataracts on February 6, 2018. Tr. at 2034. Plaintiff opted to proceed with surgery. *Id.*

On February 28, 2018, Plaintiff described deep, discomforting, dull, shooting, and stabbing pain in her lumbar spine that occurred intermittently. Tr. at 2077. She rated it as a five. *Id.* She stated her pain was aggravated by ascending stairs, changing positions, ADLs, lifting, lying down, standing, and walking. *Id.* She endorsed difficulty walking, paresthesia, and muscle weakness. Tr. at 2078. Dr. Parker refilled Oxycodone HCl 10 mg. *Id.*

Plaintiff complained of worsening low back pain on March 28, 2018. Tr. at 2073. She rated her pain as a seven and described it as radiating from her back to her bilateral ankles, calves, and feet. *Id.* She stated her symptoms were aggravating by walking, ascending and descending stairs, sitting, twisting, lying down, bending, rolling over, and nearly all ADLs. *Id.* She endorsed generalized weakness, difficulty walking, paresthesia, gait disturbance, anxiety, and muscle weakness. Tr. at 2074. Dr. Parker refilled Oxycodone HCl 10 mg three times a day and Hysingla ER 30 mg. Tr. at 2074–75.

Plaintiff rated her back pain as a five on April 25, 2018. Tr. at 2409. PA Montague-Smith refilled Oxycodone HCl 10 mg and Hysingla ER 30 mg. Tr. at 2411.

Plaintiff rated her pain as a nine and stated it was worsening on May 23, 2018. Tr. at 2406. She described persistent pain in her lower back, gluteal area, legs, and bilateral ankles, calves, and feet. *Id.* She stated her pain was

aggravated by stair climbing, bending, performing ADLs, extending, sitting, standing, twisting, and walking. *Id.* PA Montague-Smith authorized a partial prescription refill, as Plaintiff had some medication remaining. *Id.*

Plaintiff rated her pain as a seven on June 20, 2018. Tr. at 2404. She indicated she was considering back surgery. *Id.* PA Montague-Smith continued Hysingla ER 30 mg every 24 hours and Oxycodone HCl 10 mg three times a day. Tr. at 2405.

Plaintiff complained of fluctuating mood due to marital problems on July 5, 2018. Tr. at 2421. She continued to decline psychiatric medication and preferred to work through her problems in therapy and counseling. *Id.* Dr. White noted normal findings on MSE. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

i.    October 25, 2016

At the first hearing, Plaintiff testified she lived in a mobile home with a friend. Tr. at 46–47. She stated she received survivor benefits. Tr. at 47. She admitted she had a driver's license, but denied driving over the prior six months. *Id.* She said her doctor had instructed her not to drive because of seizures and a recent stroke. *Id.*

Plaintiff described herself as 5'2" tall and weighing 180 pounds. Tr. at 56. She testified she obtained an associate degree in human services in 2009. Tr. at 48–49. She said she worked part-time in a work study program while taking college courses. Tr. at 49. Prior to her work study position, she said she worked as a sales associate at Wal-Mart, where she stocked, changed prices, and served as a cashier. Tr. at 49–50. She stated she left the job at Wal-Mart because it was too strenuous on her back and body. Tr. at 50. Before she worked at Wal-Mart, she testified she worked as an assistant manager at Kentucky Fried Chicken ("KFC"), where she handled scheduling, shift changes, and money counts for bank deposits. Tr. at 50–51. She admitted she also worked temporarily as a housekeeper. Tr. at 51.

Plaintiff testified she returned to work at Wal-Mart for three or four months in 2013, but stopped working for a second time because the job was too strenuous on her back and body and she had difficulty traveling. Tr. at 51–52. She said she had been scheduled for overnight shifts and found herself falling asleep while driving. *Id.* She stated her most recent work at Wal-Mart was part-time and ranged from eight to 24 hours per week. Tr. at 56. She said she sometimes missed days of work because of her asthma and back pain. *Id.* She admitted she was terminated from Wal-Mart because she called in sick too many times. Tr. at 57.

Plaintiff stated she had been unable to perform her regular household chores like cleaning her bathroom since her stroke. Tr. at 52. She admitted she could bathe and dress herself, but said she struggled to engage in grocery shopping and bend down to tie her shoes. *Id.* She said she had developed headaches and vertigo following the stroke. Tr. at 53. She stated she attended church the prior Sunday, but had last attended prior to her stroke, about a month earlier. Tr. at 55. She said she typically watched television and read when she could focus. *Id.* She admitted she could cook and perform most household chores prior to her stroke, but said she was only able to do a little laundry since the stroke. Tr. at 56. She stated that prior to her stroke, she was able to do chores for about 20 minutes before her back pain increased and required she rest for 30 minutes. Tr. at 62–63.

Plaintiff testified pain in her back and hip affected her abilities to stand and walk prior to the stroke. *Id.* She said injections and pain medication "t[ook] the edge off," but did not relieve her pain. Tr. at 53–54. She rated her back pain as between a seven and an eight. Tr. at 57. She described it as constant and radiating to her legs and hip. Tr. at 57–58. She said the injections reduced her pain to a four or five for about six weeks. Tr. at 58. She indicated strenuous activities increased her pain. *Id.*

Plaintiff estimated she could stand for 20 to 30 minutes at a time. Tr. at 59. She indicated she could sit for 30 minutes to an hour. *Id.* She said she

spent about 30% of the day lying down to decrease pain. Tr. at 60–61. She indicated she had bad days twice a week when she was in bed for most of the day. Tr. at 61. She said she could lift no more than 10 pounds. Tr. at 62. She stated her pain affected her concentration when she attempted to read. Tr. at 64. She indicated her pain had led to depression and a desire not to get out of bed or care for her hygiene. Tr. at 64–65. She said she took medication for depression that helped. Tr. at 65.

### ii.    July 17, 2018

At the second hearing, Plaintiff testified she was taking medication for asthma, back pain, nerve pain, high cholesterol, migraines, and mood stabilization, as well as a diuretic and potassium. Tr. at 20–21. She said she was using a CPAP machine during the night. Tr. at 21.

Plaintiff stated she had stopped helping with her daughter's business nearly a year prior. *Id.* She said she spent most of her time reading and watching television. *Id.* She indicated she attended church on Sundays and occasionally participated in a Bible study on Mondays. *Id.*

Plaintiff testified her pain precluded her from working eight hours a day and five days a week. Tr. at 23. She described pain in her lower back that radiated down her hip and lower leg. *Id.* She said it prevented her from standing and walking for more than 30 minutes to an hour. Tr. at 23–24. She stated her pain necessitated she lie down for an hour to an hour-and-a-half

after being up for 30 minutes to an hour. Tr. at 24. She indicated she experienced increased pain approximately five days a month that required she lie in bed for the majority of the day. Tr. at 24–25. Plaintiff described migraines that occurred twice a week. Tr. at 25–26. She said they would resolve after a couple of hours if she would take her medication and lie in a dark room. Tr. at 26. She stated her doctors were doing blood work to try to figure out why her energy level was so low. *Id.*

Plaintiff testified that she performed chores around her home that included mopping with a Swiffer, cleaning her refrigerator, washing dishes, sweeping, vacuuming, and doing laundry. Tr. at 27. She stated she performed the chores sporadically and for 30 minutes to an hour at time. Tr. at 27–28. She said she would sit or lie down for one to two hours between chores. *Id.* She indicated she could lift no more than 10 pounds. Tr. at 28.

Plaintiff said her depression affected her daily. *Id.* She described difficulty remaining focused and being easily distracted. Tr. at 29. She said she spent most days in her home with her husband and did not go shopping. *Id.* She stated her opiate medications caused her to feel sleepy and "in a fog." Tr. at 30. She indicated she could not drive while taking them. *Id.* She said she had difficulty sleeping despite use of the CPAP machine. Tr. at 31.

b.    Vocational Expert Testimony

i.    October 25, 2016

Vocational Expert ("VE") Thomas Neil, Ph.D., reviewed the record and testified at the hearing. Tr. at 65–69. The VE categorized Plaintiff's past relevant work ("PRW") at Wal-Mart as consisting of two job descriptions, a sales attendant, *Dictionary of Occupational Titles* ("*DOT*") number 299.677-010, which required light exertion and had a specific vocational preparation ("SVP") of two, and a store laborer, *DOT* number 922.687-058, which required medium exertion and had an SVP of two. Tr. at 66. He classified Plaintiff's job at KFC as that of a manager of fast food, *DOT* number 185.137-010, which required light exertion and had an SVP of five. *Id.* However, he classified the job as having an SVP of four as performed based on Plaintiff's description in the written record of having supervised, but not having hired and fired other workers. Tr. at 66–67. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform work at the light exertional level; could occasionally stoop, kneel, crouch, and crawl; could have no exposure to pulmonary irritants, such as concentrated dusts and odors; and could have only occasional exposure to hazards such as a unprotected heights and driving. Tr. at 67. She asked if the hypothetical individual would be able to perform any of Plaintiff's PRW. *Id.* The VE testified that the hypothetical individual would be able to perform Plaintiff's PRW as a sales

attendant and a fast food lead worker. Tr. at 67–68. The ALJ asked whether there were any other jobs the hypothetical person could perform. Tr. at 68. The VE identified light jobs with an SVP of two as a ticket seller, *DOT* number 211.467-030, a mail clerk, *DOT* number 209.687-026, and a checkroom attendant, *DOT* number 358.677-010, with 300,000, 36,000, and 67,000 positions in the national economy, respectively. *Id.*

Plaintiff's attorney asked the VE to consider that the individual would be unable to maintain persistence, concentration, or pace for two-hour increments. *Id.* The VE testified the individual would be unable to perform work at any exertional or skill level. Tr. at 69.

Plaintiff's attorney asked the VE to consider that the individual would miss three or more days of work per month because of her impairments. *Id.* The VE stated the individual would be unable to meet performance standards in any job. *Id.* Plaintiff's attorney confirmed with the VE that an individual who was off task or missed work 15% of the time would not be able to perform any jobs. *Id.*

### ii.    July 17, 2018

VE Coraetta K. Harrelson reviewed the record and testified at the second hearing. Tr. at 32–34. The ALJ asked the VE if she would stipulate to the prior VE's testimony identifying Plaintiff's PRW. Tr. at 32–33. The VE said she would. Tr. at 33. The ALJ asked the VE to consider an individual of

Plaintiff's vocational profile who would be off task 20% of the time. *Id.* She asked if the individual could perform any jobs. *Id.* The VE stated there would be no jobs, as the time off task would not be tolerated. *Id.*

Plaintiff's attorney asked the VE to consider that the individual would consistently miss two or more days of work per month. *Id.* The VE stated that would exceed the standard for attendance and punctuality for competitive employment. *Id.* She explained that most employers would expect an employee to work for at least a year before being furnished five sick and five vacation days. Tr. at 34.

Plaintiff's attorney asked if Plaintiff had any transferable skills from her PRW. *Id.* The VE testified that she did not. *Id.*

### 2.    The ALJ's Findings

In her decision dated December 11, 2018, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2016.
2.    The claimant has not engaged in substantial gainful activity since July 19, 2012, the amended alleged onset date (20 CFR 404.1571, et seq., and 416.971, et seq.).
3.    The claimant has the following severe impairments: degenerative disc disease and asthma (20 CFR 404.1520(c) and 416.920(c).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light

work as defined in 20 CFR 404.1567(b) and 416.967(b) with: frequent climbing ramps/stairs and balancing; no climbing ladders, scaffolds, or ropes; occasional stooping, kneeling, crouching, and crawling; no exposure to pulmonary irritants (concentrated dusts and odors); and, occasional exposure to hazards including unprotected heights and driving.

6.    The claimant is capable of performing past relevant work as a sales associate and fast food manager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from July 19, 2012, through the date of this decision (20 CFR 404.1520(f) and 416.920(f).

Tr. at 186–94.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ erred in concluding Plaintiff could perform her PRW;

2)    the ALJ did not provide sufficient rationale for rejecting the medical opinions of record;

3)    the ALJ failed to properly evaluate Plaintiff's subjective allegations; and

4)    the case should be remanded for an award of benefits.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly

apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[9] (4) whether such impairment prevents claimant from performing

---

[9] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20

PRW;[10] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform

---

C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[10] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which she was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v.*

*Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Ability to Perform PRW

Plaintiff argues the ALJ erred in determining she could perform her PRW. [ECF No. 14 at 6]. She maintains that because the VE testified her work at Wal-Mart was a composite job consisting of tasks of both a sales attendant and a store laborer, the ALJ erred in separating the position and finding she could perform PRW as a sales attendant. *Id.* She contends her prior work as a fast food assistant manager should not have been credited as PRW because her earnings in the job were not consistent with SGA. *Id.* She

argues that because she worked as an assistant manager at KFC in 2005 only and her average monthly earnings over the 12-month period were below the threshold amount for SGA, the ALJ erred in crediting the job as PRW. *Id.* She claims her inability to perform PRW and lack of transferable skills directed a finding under Grid Rule 202.06 that she was disabled as of her amended alleged onset date, which coincided with her fifty-fifth birthday. *Id.* at 6, 7, 12.

The Commissioner argues the evidence supports the ALJ's conclusion that Plaintiff could perform her PRW. [ECF No. 15 at 14–15]. He concedes that the job of sales associate was part of a composite job and should not have been considered as PRW. *Id.* at 14 n. 7. However, he maintains Plaintiff's work as a fast food assistant manager was PRW because she reported having performed the job between February and July 2005 and her earnings over that period were in excess of the monthly SGA threshold amount. *Id.* at 14–15.

In her reply, Plaintiff argues the record contains conflicting evidence as to the length of time that she performed the job as a fast food manager and that the ALJ should have resolved evidence as to the actual period of work involved prior to considering the job to be PRW and using it to deny her claim for benefits. [ECF No. 19 at 3–4]. She alternatively maintains that if she

performed the job for six months or less, as the Commissioner claims, she did not perform it for long enough to acquire the necessary skills. *Id.* at 5.

For a job to be considered as PRW, the claimant must have performed it "within the last 15 years"; it must have "lasted long enough for [her] to learn to do it"; and it must be "substantial gainful activity." 20 C.F.R. §§ 404.1565, 416.965. SGA generally involves doing significant physical or mental activities for pay or profit. 20 C.F.R. §§ 404.1572, 416.972. If a claimant's earning from employment are at or above a specific amount set forth in the regulations, she is presumed to have demonstrated the ability to engage in SGA. 20 C.F.R. §§ 404.1574, 404.1575, 416.974, 416.975.

The regulations direct a finding that a claimant is "not disabled" at step four if her RFC allows her to meet the physical and mental demands of her PRW as she actually performed it or as it is described in the *DOT* as customarily performed throughout the economy. SSR 82-62. The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). Consequently, she must show that her impairments prevent her from returning to PRW. *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).

Nevertheless, the regulations direct the ALJ that "[p]ast work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform

62

the functional activities required in this work." *Id.* In evaluating whether a claimant may perform her PRW, the ALJ must consider: (1) the claimant's statements as to which PRW requirements she can no longer meet and her reasons as to why she is unable to meet those requirements; (2) medical evidence establishing how the impairments limit the claimant's ability to meet the physical and mental requirements of the work; and, in some cases, (3) supplementary or corroborative information from other sources such as employers, the *DOT*, etc., on the requirements of the work as generally performed in the economy. *Id.* Because a determination as to whether a claimant can perform PRW is important and sometimes even controlling, it is important that the ALJ make every effort "to secure the evidence that resolves the issue as clearly and explicitly as circumstances permit." *Id.*

The ALJ must make the following specific findings of fact to support a determination that the claimant can perform her PRW: (1) a finding of fact as to the claimant's RFC; (2) a finding of fact as to the physical and mental demands of PRW; and (3) a finding of fact that the claimant's RFC would permit a return to her PRW. *Id.*

The ALJ made the requisite findings of fact, assessing an RFC for a reduced range of light work, considering the physical and mental demands of Plaintiff's PRW, and concluding that her RFC would permit her to return to

her PRW as performed. She explained her conclusion that Plaintiff could

perform her PRW as follows:

> At the prior hearing, the vocational expert testified that the claimant has past relevant work as a sales associate (D.O.T. # 299.677-010), which is classified as light work (SVP 2)[;] a store[] laborer, (D.O.T. # 922.687-058), which is classified as medium work (SVP 2)[;] and, a fast food manager (D.O.T. #185.137-010), which is classified as light work (Classified as SVP 5, but performed as SVP 4).
>
> The vocational expert testified that based on the residual functional capacity set forth above, the claimant could perform her past work as a sales associate and a fast food manager as actually performed. In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform the work as actually and generally performed.

Tr. at 194. The ALJ's explanation is flawed to the extent that she broke down

Plaintiff's prior composite job and found she could perform work as a sales

associate. However, the ALJ's error may be harmless if she correctly

considered Plaintiff's work as a fast food manager to be PRW and if her RFC

would allow her to perform that work.

The record contains conflicting evidence as to how long Plaintiff worked

at KFC. Plaintiff included the job at KFC on a work history report in which

she indicated she worked in the job from February to July 2005. Tr. at 510.

She described her duties as "customer service, cashier, supervise" and

indicated she earned $6.00 an hour and worked eight hours a day and 5 days

a week. Tr. at 513. A document labeled "CLAIMANT'S WORK

BACKGROUND" indicates Plaintiff worked at KFC in Conway, South Carolina between February and August 2005 as an assistant manager. Tr. at 575. A second document with the same label indicates Plaintiff worked as an assistant manager at KFC from February 2005 to July 2005. Tr. at 585. Despite Plaintiff's indications that she worked at KFC from February to July or August 2005, KFC reported earnings for her in all four quarters of 2015. *See* Tr. at 468 (reflecting "CCCC" for quarters of coverage in 2005). The earnings data would suggest Plaintiff worked at KFC through at least early-October 2005. Although the ALJ questioned Plaintiff about her job duties as an assistant manager at KFC, she did not inquire as to long Plaintiff performed the job. *See* Tr. at 50–51.

The court is not persuaded by Plaintiff's argument that the amount she earned while working at KFC was not consistent with the earnings required for SGA. The detailed earnings query shows Plaintiff earned $9,805.01 from KFC of Loris, Inc., in 2005. Tr. at 463. A chart in the record indicates a monthly earnings amount of $830 was considered to be SGA for non-blind individuals in 2005. Tr. at 475; *see also Substantial Gainful Activity*, Social Security Administration (August 13, 2020) (available from ssa.gov/oact/cola/sga.html) (reflecting SGA as $830 per month for non-blind individuals in 2005). Although the record contains conflicting evidence as to when Plaintiff last worked, she consistently reported that she started the job

in February 2005. *Compare* Tr. at 510, *with* Tr. at 575, *and* Tr. at 585 (all reflecting a start date of February 2005). Her reports are consistent with recorded earnings from KFC beginning in the first quarter of 2005. *See* Tr. at 476. Thus, Plaintiff erroneously urges the court to divide her 2005 earnings by 12 where the evidence supports dividing them by no more than 11. If Plaintiff were to have worked at KFC from February through December 2005, her average monthly earnings would have been $891.37, which is above the monthly average amount to be considered SGA. Therefore, Plaintiff's earnings at KFC supported the ALJ's classification of her job as PRW.

The court further rejects Plaintiff's argument that her job at KFC was not PRW because it was not performed for a sufficient period. The *DOT* defines SVP as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *DOT*, Appendix C, 1991 WL 688702. The VE identified the job as described in the *DOT* as a "manager of fast food" with an SVP of five, but noted Plaintiff performed the job with an SVP of four because she did not hire and fire other employees. Tr. at 66–67. Jobs with an SVP of four require over three months and up to and including six months of training. *Id.* While the record contains conflicting evidence as to whether Plaintiff performed the job for six or more months, the uncontroverted record shows she had over three months of experience. *See*

66

Tr. at 486, 510, 575, 585. Plaintiff's report as to hours worked and rate of pay indicate she likely worked for at least 40 weeks, given a pay rate of $6.00 per hour, eight hours a day, and five days a week. *See* Tr. at 513. The earnings report also suggests she performed the job for over six months, as she reported earnings in all four quarters of 2005. *See* Tr. at 486. Therefore, substantial evidence supports the ALJ's finding that Plaintiff acquired the sufficient training for her work as a fast food manager to be considered PRW.

The court further notes the absence of objection to the classification of the job as PRW during either hearing. *See generally* Tr. at 32–34, 65–69; *see also Coleman v. Colvin*, C/A No. 0:14-2697-RBH, 2015 WL 5474674, at *19 (D.S.C. Sept. 16, 2015) (providing "the court is unpersuaded by [plaintiff's] attempt to now challenge the vocational expert's testimony and the ALJ's findings and point out possible conflicts when none was raised during the proceeding").

Given the foregoing, substantial evidence supports the ALJ's classification of Plaintiff's work as a fast food assistant manager as PRW. If it is supported by substantial evidence, a determination that a claimant can perform PRW at step four is dispositive. However, Plaintiff further alleges the ALJ erred at step four because she failed to appropriately consider the medical opinions of record and her subjective allegations in evaluating her RFC.

The RFC assessment should consider all the relevant evidence and account for all of the claimant's medically-determinable impairments. 20 C.F.R. § 404.1545(a), 416.945(a). It must include a narrative discussion describing how all the relevant evidence supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184 at *7 (1996). The ALJ must explain how any material inconsistencies or ambiguities in the record were resolved. SSR 16-3p, 2016 WL 1119029, at *7. "Thus, a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

Because a finding of "not disabled" at step four is dependent on a proper RFC assessment, the court considers whether substantial evidence supports the conclusion at step four given Plaintiff's arguments that the ALJ did not properly consider the medical opinions of record and her subjective allegations in assessing her RFC.

    2.     Evaluation of Medical Opinions

On December 13, 2017, the Appeals Council remanded Plaintiff's claims to the ALJ with the following instructions:

> The hearing decision (page 9) gives great weight to the opinion from consultative examiner Dr. A. Mason Ahearn dated June 4, 2014 (Exhibit B10F) and partial weight to the opinions from the State agency medical consultants (Exhibit B1A, B2A, B6A and B7A) but does not fully evaluate the opinions. The State agency medical consultants found the claimant is limited to no overhead reaching due to cervical spine fusion (Exhibits B1A/10, B2A/10, B6A/13, and B7A/13) and Dr. Ahearn found the claimant cannot do overhead work or any job involving bending or stooping (Exhibit B10F/5). The decision does not explain why these limitations were not included in the residual functional capacity. Further consideration of this opinion evidence with an assessment of the weight accorded the evidence is necessary.

Tr. at 177.

> Dr. Ahearn provided the following opinion:

> I don't believe she is capable of working as a stocker at Walmart. She can't work in any job involving long standing, long walking, lifting over 20 pounds, bending, stooping, and negotiating ladders, catwalks, or repeated stair flights. She can't do overhead work. Given these restrictions, I believe she is capable of sedentary and perhaps light work.

Tr. at 1352.

Drs. Saito and Upchurch indicated Plaintiff had an RFC for light work, but should avoid overhead reaching and only occasionally climb ramps and stairs. *See* Tr. at 81–84, 117–20.

Plaintiff argues the ALJ did not comply with the instructions in the Appeals Council's remand order in that she did not properly weigh or explain

her consideration of opinions from Drs. Ahearn, Saito, and Upchurch and did not consider their consistency. [ECF No. 14 at 14–18].

The Commissioner argues the ALJ complied with the Appeals Council's order in evaluating the opinion evidence on remand. [ECF No. 15 at 15–18]. He maintains the ALJ explained that she did not give weight to "the portions of the opinions indicating that Plaintiff could not perform overhead work, bending, or stooping, because they were inconsistent" with the record as a whole and the lack of evidence from the relevant period supporting restrictions as to overhead reaching. *Id.* at 16. He contends the ALJ noted Plaintiff's providers reported unremarkable musculoskeletal and neurological findings over the relevant period and her reported activities showed no limitation in her abilities to reach overhead, bend, and stoop occasionally. *Id.* at 16–17.

The applicable regulations require ALJs to "evaluate every medical opinion [they] receive." 20 C.F.R. §§ 404.1527(c), 416.927(c).[11] When the record lacks an opinion from a treating medical source or if the ALJ declines to assign controlling weight to a treating source's opinion, "five factors are utilized to determine what lesser weight should instead be accorded to the

---

[11] Because Plaintiff filed her claim prior to March 27, 2017, the undersigned considers the ALJ's evaluation of medical opinions based on the rules codified by 20 C.F.R. §§ 404.1527 and 416.927. *See* 20 C.F.R. §§ 404.1520c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 apply"); *see also* 82 Fed. Reg. 15,263 (stating the rescissions of SSR 96-2p, 96-5p, and 06-3p were effective for "claims filed on or after March 27, 2017").

opinion." *Brown v. Commissioner Social Security Administration*, 873 F.3d 251, 256 (4th Cir. 2017). These factors include "[l]ength of the treatment relationship and the frequency of examination," "[n]ature and extent of the treatment relationship," "'[s]upportability' in the form of the quality of the explanation provided for the medical opinion and the amount of relevant evidence—'particularly medical signs and laboratory findings'—substantiating it," "'[c]onsistency,' meaning how consistent the medical opinion is with the record as a whole,'" and "'[s]pecialization,' favoring 'the medical opinion of a specialist about medical issues related to his or her area of specialty.'" *Id.* (citing 20 C.F.R. 404.1527(c)(2), (3), (4), (5)). The ALJ should also consider "any other factors 'which tend to support or contradict the medical opinion.'" *Id.* (citing 20 C.F.R. § 404.1527(c)(6)). The regulations directs ALJ's to generally allocate greater weight "to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not examined [her]." 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1).

"[A]bsent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion," *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per

curiam), the court should not disturb the ALJ's weighing of the medical opinions of record.

The ALJ gave "great weight to Dr. Ahearn's opinion that the claimant could perform sedentary to light work" as it was "consistent with the findings of his exam, the objective evidence of record, and the claimant's reported activities (Exhibit B10F)." Tr. at 192. However she gave no weight "to his finding that the claimant could not perform overhead work, bending, or stooping." *Id.* She wrote "[w]hile the claimant underwent cervical fusion prior to the amended onset date, the treatment notes during the relevant period do not document any limitations in reaching more than one year following the surgery." *Id.*

The ALJ gave "partial weight" to Drs. Saito's and Upchurch's opinions regarding Plaintiff's physical limitations "to the extent their opinions are consistent with the objective evidence of record." Tr. at 193. However, she gave no weight to their opinions that Plaintiff would be limited in overhead reaching due to her history of cervical fusion. *Id.* She noted there was "no medical evidence since the amended onset date to indicate that the claimant had any limitations in reaching more than one year following her neck surgery." *Id.*

The court finds several errors in the ALJ's evaluation of Drs. Ahearn's, Saito's, and Upchurch's opinions. Although the ALJ gave great weight to Dr.

72

Ahearn's opinion, except as to Plaintiff's abilities to perform overhead work, bend, and stoop, she failed to reconcile her finding that Plaintiff could perform her PRW as actually performed with his indication that Plaintiff could not engage in any job involving "long standing" and "long walking," Tr. at 1352. *See* Tr. at 513 (describing Plaintiff's PRW at KFC as requiring she stand half the time and walk half the time). The ALJ did not consider Dr. Ahearn's specialization as an orthopedic surgeon in evaluating his opinion as to permanent restrictions imposed by ACDF in accordance with 20 C.F.R. § 404.1527(c)(5) and § 416.927(c)(5). She did not address whether his opinion was supported by his findings on exam in accordance with 20 C.F.R. § 404.1527(c)(3) and § 416.927(c)(3). The ALJ failed to credit the consistency of the opinions, as all three physicians who considered Plaintiff's functional abilities reached the same conclusion as to overhead reaching. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c). She did not consider whether the opinions were consistent with findings on CT myelograms of the cervical spine. *See id.* She rejected all three physicians' opinions as to Plaintiff's ability to reach overhead based on an absence of evidence of limitations in reaching more than a year following ACDF without reconciling that the opinions had been rendered more than a year following the surgery. She also failed to consider that the record following Plaintiff's AOD contained no functional assessment as to her ability to engage in overhead reaching. Thus, the ALJ did not reject

the medical opinions because the evidence showed Plaintiff's ability to reach overhead had improved, but instead rejected them because the record was silent as to her ability to reach overhead during the relevant period.

The ALJ failed to provide an adequate explanation for the weight she accorded to the medical opinions despite the Appeals Council's remand on that issue. Although the court is not to reweigh the evidence, it cannot dismiss an ALJ's failure to evaluate the relevant regulatory factors in weighing the medical opinions. Therefore, substantial evidence does not support the ALJ's evaluation of the medical opinions of record.

### 3.     Consideration of Subjective Allegations

Plaintiff argues the ALJ provided inadequate reasons for discounting her alleged symptoms and limitations. [ECF No. 14 at 18–19]. She maintains the ALJ overstated her ADLs and failed to explain why he considered them inconsistent with her allegations. *Id.* at 19–20. She contends the ALJ incorrectly concluded the objective evidence did not support her allegations because the objective evidence documented significant abnormalities and all the medical source opinions suggested greater restrictions than the ALJ assessed. *Id.* at 21.

The Commissioner argues the ALJ cited specific evidence and explained her reasons for finding Plaintiff's subjective complaints were not completely supported by the objective evidence and her ADLs. [ECF No. 15 at

19–20]. He maintains that, although the ALJ did not accept all of Plaintiff's allegations, he considered many of her subjective complaints in assessing the RFC. *Id.* at 20–21.

After determining the claimant's impairments could reasonably produce her alleged symptoms, the ALJ is required to "evaluate[s] the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability to perform basic work activities." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(c)). The ALJ must "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6. However, she is not to evaluate the claimant's symptoms "based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Id.* at *4. The ALJ must consider other evidence that "includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." *Id.* at *5; *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c) (listing factors to consider, such as ADLs; the location, duration, frequency, and intensity of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an

75

individual's functional limitations and restrictions due to pain or other symptoms).

The ALJ must explain which of the claimant's symptoms she found "consistent or inconsistent with the evidence in [the] record and how [her] evaluation of the individual's symptoms led to [her] conclusions." SSR 16-3p, 2016 WL 1119029, at *8. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869 (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). She must evaluate the "individual's symptoms considering all the evidence in his or her record." SSR 16-3p, 2016 WL 1119029, at *8.

The ALJ found Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms," but considered her statements about the intensity, persistence, and limiting effect of her symptoms to not be "completely supported by the objective evidence of record." Tr. at 190. She noted Plaintiff had not required repeated emergency treatment or inpatient hospitalization for her impairments. *Id.* She cited Plaintiff's reports of improved symptoms after participating in physical therapy, receiving medial branch blocks, engaging in water aerobics, and taking Tramadol and Flexeril at the appointed times. *Id.* She referenced Drs. Parker's and Pottharst's indications that Plaintiff's condition was stable with medication

76

management. *Id.* She acknowledged Plaintiff's reports of stable asthma symptoms. Tr. at 191. She stated Plaintiff's "conservative course of treatment" was "inconsistent with a level of severity that would preclude the claimant from sustaining any work activity." *Id.* She wrote "[t]he doctors' own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were disabled." *Id.* She referenced Plaintiff's reports of cooking, cleaning, driving, going out to eat, attending church, performing light errands/household chores, watching television, reading, attending classes, and using the computer" and noted her activities were "not limited to the extent one would expect, given her complaints of disabling symptoms and limitations." Tr. at 192. She noted evidence of work activity after Plaintiff's AOD. *Id.*

She wrote the following:

In sum, the claimant's severe impairments include degenerative disc disease and asthma. While I do not find the claimant's subjective complaints of limited ability to sit, stand, walk, lift, carry, and bend to be completely consistent with the objective evidence, I have given the claimant the benefit of the doubt in limiting the amount she can sit, stand, walk, lift, carry, climb, balance, stoop, kneel, crouch, crawl, and be exposed to hazards. I have considered her asthma in restricting her exposure to respiratory irritants. There is nothing in the record to support the claimant's report of a need to lie down during the day. I cannot find the claimant's allegations that she is incapable of all work activity to be consistent with the evidence. The claimant's daily activities were inconsistent with her allegations of disabling impairments, but are fully consistent with the residual capacity.

*Id.*

The ALJ's explanation of her decision to discredit Plaintiff's statements reflects cherrypicking of the evidence and incomplete evaluation in contravention of 20 C.F.R. § 404.1529(c) and § 416.929(c) and SSR 16-3p. In particular, the ALJ did not consider Plaintiff's complaints and descriptions of pain and other symptoms to her medical providers in accordance with 20 C.F.R. § 404.1529(c) and § 416.929(c). She did not address changes in Plaintiff's treatment and medication regimen. *See id.* She cited some evidence of benign exams, while failing to acknowledge Plaintiff's provider's observations of antalgic gait, spasms, TTP, absent patellar and Achilles reflexes, increased muscle tone, and pain behavior on exams. *See id.; see also* Tr. at 1389, 1404, 1407, 1411, 1415, 1419, 2106, 2087. She cited Plaintiff's various methods of treatment, including use of a TENS unit, narcotic and other pain medications, ACDF surgery, facet injections, nerve blocks, and physical therapy, without acknowledging that the efforts she undertook to treat her pain were consistent with her allegations. *See* Tr. at 190. The ALJ also erroneously equated Plaintiff's physicians' descriptions of stable symptoms or improved symptoms during some visits with a lack of severity. *See Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) ("Simply because one is characterized as "stable" or "improving" does not necessarily mean that she is capable of doing light work.").

The undersigned further notes that, although the ALJ purports to have limited the amount of time Plaintiff could stand and walk in the RFC assessment, the RFC assessment is for light work[12] and includes no provisions limiting standing and walking beyond the full range contemplated at the light exertional level. Although the ALJ noted Plaintiff's ADLs were inconsistent with a finding that she was "incapable of all work activity," Tr. at 192, she did not explain how they were consistent with a finding that she could perform the full range of light work or her PRW that required she stand and walk for an entire eight-hour shift.

Given the foregoing, the court finds substantial evidence does not support the ALJ's evaluation of Plaintiff's subjective allegations.

### 4.    Remand for Award of Benefits

Plaintiff argues the court should remand the case for an award of benefits because the record does not support the ALJ's denial. [ECF No. 14 at 22]. She maintains a remand for further administrative proceedings would serve no useful purpose. *Id.* at 22–23.

The Commissioner argues remand for an award of benefits is inappropriate, as Plaintiff has not proven she is disabled. [ECF No. 15 at 21].

---

[12] Light work is defined in 20 C.F.R. § 404.1567(b) and § 416.967(b), as involving lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds and requiring either a good deal of walking or standing or sitting most of the time with some pushing and pulling of arm or leg controls. Light work generally requires "a good deal of walking or standing." 20 C.F.R. §§ 404.1567(b), 416.967(b).

"Whether to reverse and remand for an award of benefit or remand for a new hearing rests within the sound discretion of the district court." *Smith v. Astrue*, C/A No. 10-66-HMH-JRM, 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011) (citing *Edwards v. Bowen*, 672 F. Supp. 230, 237 (E.D.N.C. 1987)). "The Fourth Circuit has explained that outright reversal—without remand for further consideration—is appropriate under sentence four 'where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose'" and "where a claimant has presented clear and convincing evidence that he is entitled to benefits." *Goodwine v. Colvin*, No. 3:12-2107-DCN, 2014 WL 692913, at *8 (D.S.C. Feb. 21, 2014) (citing *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974); *Veeney ex rel. Strother v. Sullivan*, 973 F.3d 326, 333 (4th Cir. 1992). An award of benefits is appropriate when "a remand would only delay the receipt of benefits while serving no useful purpose, or a substantial amount of time has already been consumed." *Davis v. Astrue*, C/A No. 07-1621-JFA, 2008 WL 1826493, at *5 (D.S.C. Apr. 23, 2008) (citing *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984); *Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982)). "On the other hand, remand is appropriate 'where additional administrative proceedings could remedy defects . . . .'" *Id.* (quoting *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989)).

The VE testified Plaintiff lacked the requisite experience perform her PRW as generally performed, Tr. at 66–67, and the record presents clear and convincing evidence that she could not perform her PRW as actually performed. Plaintiff described her work as a fast food assistant manager as requiring she stand and walk constantly throughout her eight-hour shifts. Tr. at 513. The objective evidence, Plaintiff's complaints to her medical providers, her course of treatment, and the medical opinion evidence suggest she was incapable of constant standing and walking over the course of an eight-hour workday throughout the relevant period. Moreover, the ALJ supposedly credited Plaintiff's allegation of limited abilities to stand and walk. *See* Tr. at 192. In addition, the three medical providers who evaluated Plaintiff's functional abilities indicated she should engage in no reaching given her history of ACDF. *See* Tr. at 82–83, 118, 1352. The *DOT* describes the job of fast food manager as requiring frequent reaching. *See* 185.137-010, MANAGER, FAST FOOD SERVICES, DOT (4th Ed., revised 1991), 1991 WL 671285. While the *DOT* does not distinguish overhead reaching from other forms of reaching, it is reasonable to assume frequent reaching contemplates at least some overhead reaching. *See Pearson v. Colvin*, 810 F.3d 204, 211 (4th Cir. 2015) ("Although the *Dictionary* does not expressly state that the occupations identified by the expert require frequent bilateral overhead reaching, the *Dictionary's* broad definition of 'reaching" means that they

certainly may require such reaching."). Thus, the totality of the evidence demonstrates Plaintiff was unable to meet the standing, walking, and reaching requirements of her PRW.

The Medical-Vocational Guidelines may direct a finding that an individual is disabled if the individual's impairments prevent her from performing her PRW and she meets specific criteria as to maximum sustained work capability, age, education, and previous work experience.[13] 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 200.00(a). Rule 202.06 of the Medical-Vocational Guidelines directs a finding that an individual is disabled if the following conditions are met:

(1)    the individual must have a maximum sustained work capability limited to light work as a result of severe medically-determinable impairments;

(2)    the individual must be of advanced age;

(3)    the individual must be a high school graduate or more, but must not have attained education that allows for direct entry into skilled work; and

---

[13] The Medical-Vocational Guidelines direct a finding on the issue of disability "[w]here the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule." 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 200.00(a). The claimant may present evidence to rebut a conclusion under the Guidelines that she is not disabled. *See id.* However, the rules are conclusive, rather than presumptive, and the ALJ may not rely on testimony from a VE to rebut the conclusion directed by the regulations. *See* SSR 83-5A, 1983 WL 31250. Therefore, even though the VE identified jobs at the light exertional level that could be performed by an individual with the assessed RFC, the VE's testimony is irrelevant as to the existence of jobs if the Medical-Vocational Guidelines direct a finding that Plaintiff is disabled.

(4)    the individual must have a history of skilled or semiskilled work, but cannot have skills that are transferable to light work.

20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 202.06.

The ALJ assessed an RFC for light work. Tr. at 189. During the first hearing, Plaintiff amended her alleged onset date to her fifty-fifth birthday, placing her in the "advanced age" category. *See* Tr. at 57; *see also* 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 201.00(d) (defining "advanced age" as "55 and over"). She completed high school and some college, but had no education that provided for direct entry into skilled work. *See* Tr. at 48–49. Her PRW was semiskilled, but the VE testified that it produced no transferable skills. Tr. at 34. Thus, Medical-Vocational Rule 202.06 directs a finding that Plaintiff is disabled. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 200.00.

As this case has been pending for nearly seven years, it has consumed a substantial amount of time, and a remand for further administrative proceedings would only delay the receipt of benefits while serving no useful purpose. *See Davis*, 2008 WL 1826493, at *5; *Parsons*, 739 F.2d at 1341; *Tennant*, 682 F.2d at 710.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the

Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for an award of benefits pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

*Shiva V. Hodges*

August 19, 2020                    Shiva V. Hodges
Columbia, South Carolina           United States Magistrate Judge